**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

CITIBANK (SOUTH DAKOTA) N.A., et al.,

      Plaintiffs,

vs.                                              Case No. 3:04-cv-1076-J-32MCR

NATIONAL ARBITRATION COUNCIL,
INC., et al.,

      Defendants.
_____ /

CHASE MANHATTAN BANK
USA, N.A.,
      Plaintiff,

vs.                                              Case No. 3:04-cv-1205-J-20MCR

NATIONAL ARBITRATION COUNCIL,
INC., et al.,

      Defendants.
_____ /

## **ORDER**

This case came before the Court for an evidentiary hearing on plaintiff Chase Manhattan Bank USA, N.A.'s ("Chase") claim for damages. On November 30, 2006, the Court held an evidentiary hearing. (Doc. 92).

**I.    BACKGROUND AND PROCEDURAL HISTORY**

This case arose out of defendants National Arbitration Council ("NAC") and Charles S. Morgan ("Morgan") (collectively "defendants") duping Chase and Citibank (South Dakota) N.A.'s ("Citibank") respective cardholders into believing that they had

the right to arbitrate "disputes" between themselves and their respective credit card company (Chase or Citibank) with NAC, a purported arbitration firm. NAC held sham arbitrations without notice to or participation from Chase or Citibank and, in each instance, entered an "award" in favor of the cardholder stating that the cardholder was absolved from any further payments to Chase or Citibank. Chase and Citibank informed their cardholders and NAC that the arbitration "demands" and subsequent awards were not in accord with their cardholder agreements. NAC issued over 262 "awards" in favor of Chase cardholders and 278 "awards" in favor of Citibank cardholders. After entry of the awards, the cardholders stopped making the required balance payments to Chase and Citibank.

On September 19, 2006, this Court awarded summary judgment in favor of Chase and Citibank on claims of tortious interference with contractual relationships and violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"). (Doc. 81). The Court also permanently enjoined defendants from engaging in their tortious conduct. (Id.).

In the Order, the Court asked Chase and Citibank whether each entity intended to pursue damages. (Id.). On September 29, 2006, Chase informed the Court of its intent to seek damages and requested an evidentiary hearing. (Doc. 82). On October 2, 2006, Citibank notified the Court that it did not intend to pursue damages. (Doc. 83). On October 4, 2006, the Court entered a Fed. R. Civ. P. 54(b) judgment in favor of Citibank. (Doc. 84). Defendants did not appeal the Citibank case. On November

30, 2006, the Court held an evidentiary hearing to determine the amount of Chase's damages. (Doc. 92).

## II.    CHASE'S DAMAGES EVIDENCE

Chase called one witness: Mr. Thomas J. Murphy.[1]    Mr. Murphy graduated from Northern Arizona University in 1992 with a bachelor's degree in Economics. Mr. Murphy has worked with Chase since, starting as a collector on the telephone and ascending to a Vice President position where he works with Chase's finance department to manage and forecast recoveries on Chase's more than 2.5 billion dollar portfolio of delinquent accounts.

Mr. Murphy testified that in his position he has participated in numerous financial forecasts wherein Chase determines its collection rate on delinquent accounts. Chase verifies their forecasts on a weekly basis to determine if their collection rates on delinquent accounts are in accord with their forecasts. To facilitate recovery on delinquent accounts, Chase has developed a detailed set of programs for Chase cardholders that fall into delinquency. The type of program offered may depend on the cardholder's personal situation (i.e., ranging from those that may need a slight reduction in their interest rate to make minimum payments to those in a more

---

[1]    Chase admitted two exhibits during the direct examination of Mr. Murphy. (Doc. 92). The first was Mr. Murphy's damages report. The second was a spreadsheet showing Mr. Murphy's damages calculations. (Id.). Defendants' counsel briefly cross examined Mr. Murphy, but submitted no other evidence.

dire financial circumstance). The following are the options Chase may offer a cardholder: (1) credit counseling to assess the individual's overall financial situation to determine whether there is some circumstance that would allow the individual to come current on his or her balance immediately; (2) the cardholder pays back the delinquent amount in a short time frame and Chase forgoes any fee; (3) a short-term reduced payment program where Chase allows a cardholder to make smaller payments at reduced interest rates for a period of six months to two years; (4) similar long-term programs for up to five years; and (5) an option for the cardholder to settle the entire balance at a reduced amount and be free from any further debt to Chase.

Mr. Murphy testified that Chase has had success with these techniques in the past primarily because cardholders understand that the adverse effect on their credit is less if they enter into some kind of reduced payment plan with Chase rather than entirely "charge off"[2] or file for bankruptcy. Mr. Murphy also testified that Chase's debt recovery techniques usually yield a recovery of approximately seven percent of the outstanding balance during each month of the six month delinquency period. At the conclusion of the six month cycle when the cardholder is about to "charge off", if the cardholder has not brought the balance back to current, Chase sells the delinquent

---

[2] A cardholder "charges off" at the conclusion of a six month delinquency cycle. If the cardholder is no longer making payments at the end of the six month cycle, he or she is said to have "charged off" and Chase does not continue collections efforts against them. Normally, after a cardholder charges off, Chase sells the balance to an outside company on the open market.

4

balance (for collection) on the open market. Chase's normal recovery on such as sale is eight percent of the outstanding balance. However, when something occurs such as defendants' tortious interference in this case, Chase's recovery percentage from a sale on the open market declines to approximately four percent. This is because Chase has to declare the special circumstance affecting the accounts when it attempts to sell them.

In this case, Mr. Murphy identified 240 Chase accounts that were involved in the NAC arbitration scam.[3] The aggregate balance of the 240 accounts was $2,648,878. Mr. Murphy studied each account for the twenty-four month period prior to when the cardholder stopped making payments.

To quantify damages, Mr. Murphy considered the payment history on each account for the prior six months. The aggregate amount of payment on all accounts for the six month period prior to the last payment is $222,717. Mr. Murphy also calculated what would have been the minimum two percent payment on each account for the six month period after the last payment on each account. The aggregate payments using the two percent analysis is $291,952.

Upon determining these sums, Mr. Murphy analyzed each account and surmised that over the six month period subsequent to the last payment on each account, the cardholder would pay the greater of (1) the average of his or her prior six

---

[3] There were other accounts, but Chase determined to limit its analysis to the 240 accounts.

payments or (2) 2% of the remaining balance for the next six months.  Taking the greater of these amounts for each cardholder, the aggregate sum is $307,051.

Mr. Murphy asserted that the $307,051 figure is a conservative estimate in view of Chase's ability to normally recover seven percent per month of the outstanding balance from a cardholder during the typical six month delinquency period and then an additional eight percent once the account is sold on the market.  Mr. Murphy reiterated that even on accounts subject to some outside circumstance (such as defendants' interference), Chase usually recouped at least four percent of the outstanding balance on an outside sale.

Mr. Murphy also testified that defendants either created or accelerated the cardholders' nonpayment because the cardholders were making regular monthly payments at the time of defendants' tortious acts (even though some were below the 2% minimum threshold), and their payment history suggested that they would not have otherwise immediately ceased making payments.  Then, once defendants convinced the cardholders that all they needed to do was post a final $10 payment to Chase and then they were absolved from making any additional payments, the cardholders stopped making payments altogether.

The second element of Chase's alleged damages are what it calls "suspicious charges".  Those are particular charges that cardholders made immediately prior to making their final $10 payment.  To label a charge "suspicious", Chase looked from

6

the point of the $10 payment on each account backwards for a period of 60 days, assessed the cardholders' spending habits and marked any charge that appeared suspicious.  For example, according to Mr. Murphy, immediately prior to making the final $10 payment, some cardholders transferred balances from other credit cards apparently thinking that those amounts would likewise be "forgiven."  On the 240 accounts, Mr. Murphy determined there were $192,947 worth of suspicious charges.  Chase claims that amount as the second portion of its damages.  In sum, Chase claims $499,998 in damages.

## III.     DISCUSSION

Chase seeks damages under its tortious interference and FDUTPA claims.  Thus, this Court will apply Florida damages law.  Under Florida law, "there must be some reasonable basis in the evidence to support the amount [of damages] awarded.  Furthermore, it is incumbent upon the party seeking damages to present evidence to justify an award of damages in a definite amount."  Camper Corral, Inc. v. Perantoni, 801 So. 2d 990, 991 (Fla. 2d DCA 2001) (citation omitted).  "Although difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as there is sufficient evidence to satisfy the mind of a prudent, impartial person as to the amount, there must be a reasonable basis in the evidence for the amount awarded."  Schimpf v. Reger, 691 So. 2d 579, 580 (Fla. 2d DCA 1997) (citations omitted).  "Damages are not rendered uncertain because they cannot be calculated with

7

absolute exactness; it is sufficient that there be a reasonable basis for computing damages even if the result may be only approximate." Hutchinson v. Bilodeau, 553 So. 2d 304, 306 (Fla. 1st DCA 1989) (citing McCall v. Sherbill, 68 So. 2d 362, 364 (Fla. 1953)).

Here, Chase has sufficiently proven its entitlement to $307,051 of damages due to defendants' tortious acts. While the Court understood at the summary judgment phase that Chase suffered some amount of damages, it had reservations about how Chase could quantify those damages. Chase, however, via the testimony of Thomas J. Murphy, concisely illustrated its methodology to recoup a portion of the balance of a cardholders account once the cardholder goes into delinquency. Based on Mr. Murphy's testimony, the Court finds the evidence indeed supports Chase's estimate that defendants' tortious acts relating to the 240 cardholder accounts caused at least $307,051 in nonpayment (damages).

This finding is based on Mr. Murphy's testimony that once any account falls into delinquency (1) the normal delinquency period is six months, (2) Chase typically recovers an average of 7% of the outstanding balance during each of those six months pursuant to its debt recovery techniques, and (3) at the charge off point at the conclusion of the delinquency period Chase normally collects approximately 4% of the account balance when it sells problematic accounts on the open market (such as those at issue here). In fact, Chase's damages formula, that from the six month

8

period subsequent to each cardholder's nonpayment it would have obtained the greater of (1) the average payment a cardholder made over the prior six months or (2) 2% of the balance over the next six month period, is indeed conservative. Chase has shown a reasonable evidentiary basis for the $307,051 portion of its damages theory.

However, the Court also finds that Chase did not meet its burden of proof concerning the claimed $192,947 of "suspicious charges" damages. While the Court well understands the difficulties in illustrating these damages, Chase did not submit sufficient evidence from which the accuracy of its "suspicious" designations could be determined. In fairness to Chase, however, had Chase submitted the actual transaction data from the individual statements it would nevertheless be difficult to discern a "suspicious charge" from a normal charge over the sixty day period prior to the final ($10) payment on each account. Absent deposing at least some of the cardholders to establish a pattern of such "suspicious charges", there was insufficient evidence for Chase to prove this element of its damages theory. Because of the speculative nature of Chase's evidence on the $192,947 worth of "suspicious charges" damages, Chase is not entitled to these damages as it has not met its burden on this amount.

Accordingly, it is hereby **ORDERED**:

1. The Court will enter Judgment in favor of Chase Manhattan Bank USA,

N.A. and against defendants National Arbitration Council ("NAC") and Charles S. Morgan ("Morgan"), jointly and severally, in the amount of **$307,051.00**.

2.     If defendants elect not to appeal, the deadline for Chase's motion for attorneys' fees is **February 7, 2007**.  Defendants' response is due on **February 21, 2007.**  As discussed on the record during the damages hearing, defendants (assuming there is no appeal in the Chase case) should also file their response to plaintiff Citibank USA, N.A.'s Motion for Attorneys' Fees (Doc. 86) on **February 21, 2007**.  The Court will then rule on both motions at the same time.

3.     If, however, defendants appeal the Chase case, defendants must nevertheless file their response to Citibank's Motion for Attorneys' Fees (Doc. 86) on **February 21, 2007** as a Fed. R. Civ. P. 54(b) judgment has been entered in the Citibank case and no appeal followed.  Thus, pursuant to Fla. Stat. § 501.2105, Citibank's motion for attorneys' fees is ripe for review.

**DONE AND ORDERED** at Jacksonville, Florida this 9th day of January, 2007.

_____
TIMOTHY J. CORRIGAN
United States District Judge

t.

Copies: counsel of record

11